# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

KELLY C. SPRINGER

      Plaintiff,

v.                                       No. CIV 12-315 JCH/LFG

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on Plaintiff Kelly C. Springer ("Springer") Motion to

Reverse and Remand for Rehearing, with Supporting Memorandum, filed October 9, 2012.  [Doc.

17.] The Commissioner of Social Security ("Commissioner" or "Defendant") issued a final decision

denying Springer's request for disability insurance benefits ("DIB") and supplemental security

income ("SSI").  Defendant filed a response [Doc. 18], and Springer filed a reply [Doc. 19.]  Having

considered Springer's motion and accompanying memorandum, exhibits attached to the motion, the

Commissioner's response, the administrative record ["AR"], and the applicable law, the Court

---

[1] **Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).**

recommends that Springer's motion be remanded for additional administrative hearings for the reasons explained below.

## I.   <u>INTRODUCTION</u>

Springer was born on May 5, 1963 [AR 36], and was 47 years old at the time of the ALJ hearing in 2010. [AR 35, 36.] She is divorced and may now live on her own, but during the benefit application process, she lived with her son and/or daughter in a trailer in Edgewood, New Mexico. [AR 127, 128, 132, 143.] Springer graduated from high school [AR 163] and received 90 hours of specialized vocational training in landscaping/nursery operations. [AR 293.]

Springer alleges she is disabled due to degenerative joint disease ("DJD"), stenosis, fibromyalgia, and depression. [AR 65, 157.] She last worked in September 2006 as a self-employed landscaper or grounds keeper. [AR 18, 21, 22, 44.] At times, she worked for various companies that hired her to maintain interior plants in businesses. Springer stopped working due to pain and difficulties with lifting.

Springer's work record indicates minimal earnings over a period of years. From 1982 to 1991, for example, her annual earnings ranged from $1100 to $8500; most of those years, she earned less than $5000. In 1992-1994, there were no earnings. In 1995-1996, Springer earned from $1600 to $4400 annually. In 1997, her earnings were $13,500. In 1998 and 1999, she earned $5000 or less. From 2000 to 2001, Springer earned from $12,000 to $15,399 annually. In 2002, her earnings were $9838, and in 2003, she earned $10,475. By 2005-2006, her earnings dropped to about $2000. [AR 134.] Springer currently receives general assistance and food stamps. [AR 45.]

Springer was married and divorced twice. She and her first husband had two children. In about 1997, her first husband died unexpectedly. [AR 357.] She and her children were able to live on death benefits that the children received. Their trailer home was paid off. In July 2009,

Springer's daughter died as a result of a car accident. [AR .] Springer had ongoing drug or alcohol problems during periods of her life but claims to be in treatment since November 2009. [AR  23.]

## II.    PROCEDURAL BACKGROUND

On March 14, 2008, Springer applied for DIB and SSI, with an onset date of September 18, 2006. [AR 18.]  Springer's DIB and SSI applications were denied on initial consideration and reconsideration. [AR 61-64.] On September 23, 2009, Springer requested an ALJ hearing. [AR 87.]

On May 18, 2010, an ALJ[2] held a hearing in Santa Fe, New Mexico. [AR 22, 36.]  Both Springer and her attorney were present at the hearing. [AR 36.] A friend of Springer's testified, as did a vocational expert.

On June 23, 2010, the ALJ issued an adverse decision, concluding that Springer was not disabled for purposes of DIB or SSI benefits. [AR 18-30.]  Springer requested review of the decision.  On February 2, 2012, the Appeals Council denied the request for review.  [AR 1-4.]

## III.    STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

---

[2]On October 6, 2009, the case was assigned to an ALJ in Fort Worth, Texas. [AR 98.]

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, she is capable of performing other work.[10]

In this case, the ALJ concluded Springer was not disabled at step four of the analysis. Specifically, the ALJ found that Springer could perform some of her past relevant work; the ALJ supported his findings, in part, with testimony of the vocational expert.  [AR 29.]

---

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent her from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

IV.   **STANDARD OF REVIEW**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

In this case, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

V.   **MEDICAL HISTORY**

***1998-2007 Records***

There are no medical records until 2005.  However, several records indicate Springer took several falls in 1998 [AR 218] that adversely affected her.

In March 2005, Springer had an MRI of her lumbar spine for lower back pain and incontinence. [AR 214.] The results indicated she had Grade I-II spondylolisthesis[11] of L5 on S1 with an associated diffuse disk bulge at this level and bilateral severe neural foraminal narrowing.[12] There was minimal spinal canal narrowing.  The radiologist thought Springer might need to have plain radiographs done for better views.  He noted small central disk protrusions at L4-5, without significant foraminal narrowing or stenosis. [AR 215.]

On June 15, 2005, Springer was seen at UNMH Orthopedics Department. [AR 208.] It was her first visit; she complained of lower back pain and bilateral leg pain.  The back pain was worse than her leg pain and had been getting worse gradually over the last 7 years.  She had no numbness but had some urinary incontinence.  She walked without a limp and could perform the heel-toe walk. Her strength was assessed as 5/5 in the bilateral lower extremities.  Xrays showed spondylolistheses

---

[11]"Spondylolisthesis grades provide doctors with a standardized, medically accepted scale to measure the severity of a vertebral slip. The grading scale measures the percentage that a vertebra has shifted compared to the vertebra beneath it. The percentages are as follows: * Grade 1: 0-25% vertebral slippage  * Grade 2: 25-50% vertebral slippage  * Grade 3: 50-75% vertebral slippage  * Grade 4: 75-100% vertebral slippage * Grade 5: vertebral disc has slipped completely off."

"Oftentimes a grade 1 spondylolisthesis will be asymptomatic, but a doctor may discover it in an X-ray for an unrelated condition. Typical spondylolisthesis symptoms for grades 1 and 2 include pain in the lower back and buttocks, muscle spasms in the lower back and legs, and tightened hamstrings. More severe symptoms are present in spondylolisthesis grades 3 and 4, which can include a protruding abdomen, difficulty walking, and possibly a pain that shoots down the length of the spine if nerve obstruction is present.  Spondylolisthesis grades 1 and 2 are often treated with exercise, rest, back bracing, or some other form of conservative treatment."
http://www.laserspineinstitute.com/back_problems/spondylolisthesis/spondylolisthesis_resources/grades/ (3/18/2013).

[12]"Foraminal narrowing, or foraminal stenosis, is a condition of the spine that can cause pain and other symptoms resulting from spinal nerve compression. At every level of the spine, a pair of nerve roots exit the spinal cord through small openings called foramina (singular: foramen). Narrowing, or stenosis, occurs when the space available for the nerve roots to pass is reduced. While narrowing of the foraminal canals does not necessarily produce symptoms, if a nerve root is irritated or compressed, it can cause pain that radiates along the length of the nerve, as well as tingling, numbness, or weakness within the muscle group innervated by the affected nerve."
http://www.laserspineinstitute.com/back_problems/foraminal_narrowing/ (3/18/13)

at L5-S1, grade I-II, and significant degenerative changes at that level [AR 211.]  There was a plan for Springer to see orthopedic surgeon, Dr. Jose Reyna, but she would follow "p.r.n." as she had financial difficulties.  Her condition was "non emergent" at this time.  The provider recommended physical therapy, and doing strengthening and truncal stabilizing exercises.  Springer also might consider injections fo the lower back and non steroidal anti-inflammatory medications.  A care provider observed that Springer was "certainly a candidate for fusion on her L5-S1 levels in the future."[13] [AR 208.] Dr. Reyna added an "addendum" to the record on June 30, 2005, stating that Springer elected to continue nonoperative treatment.  If her condition worsened, they could discuss surgical intervention options. [AR 209.]

It is unknown if Springer obtained physical therapy then, did exercises for her back, or took non-steroidal anti-inflammatory injections.  There are no other medical records in 2005, and none from 2006 through 2007, although Springer asserts the onset of disability was September 8, 2006, the date she last worked. [AR 18.]

### *2008 Records*

On April 5, 2008, Springer was seen by Nurse Practitioner Ilah Young ("NP Young") at First Choice. [AR 335.] There are a number of medical records written by NP Young, and all of them are partially illegible or very difficult to read.  On virtually every First Choice progress note, the provider indicated that Springer was a current smoker but "never" used alcohol or drugs.  This was not accurate, based on later reports by Springer to consultative examiners when she disclosed a

---

[13]Springer's attorney does not always accurately reflect the record in his argument.  For example, he stated that in 2005, Springer was a candidate for surgical fusion but she could not proceed for financial reasons. [Doc. 17, at 4.] The medical record actually states she was a candidate for fusion "in the future." Her condition at that time was "non emergent."  [AR 208.] Moreover, Dr. Reyna stated that Springer elected to continue with non-operative treatment.

significant history of drug and alcohol abuse.  Indeed, as noted below, Springer was using drugs and drinking during at least parts of 2008 and 2009, if not presently as well.

At the April 5 appointment, Springer rated her pain level 10/10 and complained of worsening pain.  She did not request more pain prescriptions but was looking at various other options, like trigger point injections.  She also was applying for help or insurance, which may have indicated her subsequent applications for DIB and SSI. [AR 335.]

In a letter, dated April 5, 2008, NP Young indicated Springer had been her patient since February 2005, and that her ongoing chronic conditions prevented Springer from serving on a jury indefinitely. [AR 336.] However, the April 5, 2008 medical record is the first medical record documenting a visit with NP Young Jones.

On April 22, 2008, Springer applied for SSI and DIB. [AR 127, 131.] She was not married at this time.  She had two children. [AR 132.] She filed a previous application for benefits with the Social Security Administration.[14] [AR 131.] During a telephone interview on April 22, the interviewer noted no limitations. [AR 151-54.]

On April 22, 2008, Springer filled out a disability report.  She was 5' 11" and weighed 210 pounds. [AR 156.] She alleged disabilities of DJD, stenosis, depression, and fibromyalgia. [AR 157.] She complained of difficulties lifting and sitting.  She suffered from pain and fatigue.  These problems first interfered with her work in November 1998, but her onset date of disability was not for another eight years, until 2006. [AR 157.] Springer continued to work during those years, although most likely, her work was on a part-time basis based on her earning records.

---

[14]The denial of Springer's first set of benefit applications was affirmed by Magistrate Judge Puglisi on March 28, 2008.  <u>Springer v. Astrue</u>, No. CIV 07-675 RLP (D.N.M. Mar. 28, 2008) [Doc. 17.]

Springer reported she worked as a landscaper from January 1990 to September 2006, and earned $13,000 a year; however, her earnings do not reflect she actually earned that amount most of those years. She described herself as an "interiorscape technician" who went to office buildings and cared for indoor plants. Heavy lifting was required for that job. She supervised one person. Springer noted in the disability form that she saw Dr. Radecki for her back and had examinations in 1999 and 2004. [AR 160.] She also saw Dr. Combs for her back in 1999. There are no corresponding medical records. Her primary care practitioner was NP Young. [AR 158-161.]

As of April 2008, Springer's medications were Flexeril (muscle relaxant); Ibuprofen (pain and swelling); Lexapro (depression); Neurontin ("sleep aide"); Percocet (pain); Phenegran (upset stomach); and Trazodone (sleep aide). [AR 162.]

On May 10, 2008, NP Young saw Springer again. As noted before, the records indicates that Springer never used alcohol or drugs. She may have tried to stop smoking as of this date. Her pain was 9/10 and she complained of an upset stomach. Toradol[15] helped for about five days but she felt pain in all of her back. She was taking more pain prescriptions. There was a long discussion about chronic fatigue and Springer's back pain. The record may indicate there was insurance coverage for physical therapy, but there are no physical therapy records at this time. [AR 285.]

There is a later report by Springer that she had been using marijuana and cocaine (occasionally) until about this date – May 2008. [AR 358.]

Springer filled out a function report on June 1, 2008. [AR 143.] She lived at home with her family. She woke up, had coffee and sometimes slept all day. She did laundry on other days and

---

[15]"Toradol is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body. Toradol is used short-term (5 days or less) to treat moderate to severe pain, usually after surgery. It is used alone or in combination with other medicines." http://www.drugs.com/toradol.html (3/18/13).

watered plants.  She watched television, could shop, picked up the house, did the dishes, fed the animals, and swept the floors if she was feeling all right.  She had to take many breaks.  Springer made dinner but not every night.  Cooking might take her 20 minutes to two hours.  She visited friends in the area.  Her children helped her.  Before her problems, she could do all the chores without breaks.  She tended to wake up at night due to pain in her legs, shoulders, hands, arms and entire body.

Springer had difficulties working in the yard. [AR 145.] She could not work outside much because of too much pain and fatigue.  She went out once a day or every other day.  She could walk short distances and drive a car.  Springer stated she had no money or that her money was gone as soon as it came in.  Her hobbies were reading, watching television, and working on the computer for short periods as she could not sit long.  Springer also could not stand or walk for long.  She tired easily.  She talked and spent time with others.  Springer went out once a month. [AR 147.] She was frustrated about losing her strength; she sometimes yelled at her children or cried.  She felt depressed.  She marked almost every box on the form, indicating she had trouble doing anything. [AR 148.] She could pay attention for 5 to 30 minutes.  She had never been fired, although in a later note, she indicated she was fired from one job [AR 218] and during the ALJ hearing, she testified she had "lost jobs." [AR 42.]

On June 2, 2008, Springer had an MRI of the lumbar spine that was sent to NP Young. [AR 283.] The MRI indicated gradual onset of lower back pain ("LBP") that extended into Springer's buttocks and down both legs with weakness and tingling in her right toes since 1998.  There was Grade 1 anterior subluxation of L5 upon S1, and multilevel disk bulges at L3-4, L4-5, and L5-S1.

There were pars defects[16] at the L5 level.  There was a high index of clinical suspicion to further confirm pars defects at L5 level.  The report showed disk space narrowing with a mild diffuse disk bulge at L5-S1, but no significant central stenosis.  At L4-5, a mild to moderate diffuse disk bulge was noted.  There was mild to moderate central stenosis. [AR 283, 339 and 340 (duplicates).]

On June 28, 2008, Springer was seen at First Choice.  She weighed 228 pounds.  Her pain level was 8/10.  The record is difficult to read but may indicate Springer reported her prescription of Percocet was stolen. [AR 279.] She complained of urinary incontinence.  NP Young appeared to believe the story of the stolen prescription, if the record can be read.  Springer was to continue with counseling, but there are no corresponding counseling records. [AR 279, 333 (duplicate).]

On July 11, 2008, Springer had a physical exam at First Choice.  She complained of depression, sleepiness, and anhedonia.[17]  She suffered from chronic pain and had financial difficulty.  Springer had no thoughts of harming herself.  She stopped taking Wellbutrin, an anti-depressant, due to dysuria.[18]  She felt pain in her arms and legs.  She took Percocet and Ibuprofen with little relief.  She believed that Neurontin helped her sleep. [AR 278.] It appears from the record that Springer did not exercise regularly.  NP Young questioned whether to change Springer's prescription to other painkillers like Darvocet or Hydrocodone the next time.  The assessment was depression/chronic pain.  Springer was to start Effexor and see "ortho" on August 1.  There is no

---

[16]"Spondylolysis is a defect of a vertebra. More specifically it is defined as a defect in the pars interarticularis of the vertebral arch.[1] The great majority of cases occur in the lowest of the lumbar vertebrae (L5). . . ."  http://en.wikipedia.org/wiki/Spondylolysis (3/18/13).

[17]Anedonia is defined as a psychological condition characterized by inability to experience pleasure in normally pleasurable acts.  http://www.merriam-webster.com/dictionary/anhedonia (3/18/13).

[18]Dysuria is defined as difficult or painful discharge of urine.  http://www.merriam-webster.com/dictionary/dysuria (3/18/13).

corresponding August 1 record.  Springer discussed her diet, exercise and smoking cessation with NP Young.

On August 19, 2008, Dr. Benjamin Buxton performed a consultative examination for disability services. [AR 218.] Springer described depression as her most disabling problem, although prior records documented that pain was her main complaint.  Springer reported no past suicide attempts, and while she had suicidal ideation at times, she had none as of this date.  Her son and daughter were living with her.  Their father died in 1997, and they were living on the childrens' death benefits.  Springer complained of debilitating back pain in the buttocks bilaterally that radiated down her posterior legs.  This pain began in 1998 and was worse.  She had two falls in 1998, months apart.  She complained of right third and fourth digit paresthesias (prickling, tingling) in her foot. There was an unrelated anesthetic area in her right shoulder blade that she said was old.  Her bowel and bladder control were essentially normal, but there was some "urge incontinence" of urine.[19]  She took Detrol LA which helped.  Springer felt some muscle weakness in her arms.

With respect to treatment for her back pain, Springer took pain medications and was taught exercises by a physical therapist.  There are no corresponding physical therapy records. [AR 218.] She had no injections for pain treatment.  She alleged debilitating fibromyalgia, although there is not necessarily a documented diagnosis of fibromyalgia unless it is in a record of NP Young that is difficult to read.  Springer reported that she was diagnosed with fibromyalgia a few years ago. [AR 219.] She later reported she had not been diagnosed with fibromyalgia but that someone advised her she had the classic symptoms.

---

[19]"Urge incontinence is a form of urinary incontinence characterized by the involuntary loss of urine occurring for no apparent reason while feeling urinary urgency, a sudden need or urge to urinate." http://en.wikipedia.org/wiki/Urge_incontinence (3/18/13).

Springer stated she had been fired from one of the companies who employed her in 2000 because she missed too much work. [AR 219.] She was no longer able to work. She could dress and feed herself. She believed she could stand for 20 minutes, walk for 15 minutes, and sit for 30 minutes. She could only lift 10 pounds. While she did some household chores, she could not vacuum. Springer was taking Flexeril, Neurontin, Trazodone, Ibuprofen, Detrol, Percocet, and Effexor.

She smoked one-half pack of cigarettes daily. [AR 219.] She weighed 236 pounds. [AR 220.] Dr. Buxton described Springer as ambulating somewhat slowly but without significant difficulty. She got on and off the exam table and up from a chair without significant difficulty. [AR 220.] She moved slowly. Her grip strength was 5/5. Her shoulder range of motion was normal. Abduction was limited to some degree by pain. Her straight leg raise was positive in the supine position, but she could reach full flexion on both sides. With sitting, Springer did not have electric pain. She was able to walk on her toes and heels and could squat half-way down. [AR 221.]

Dr. Buxton noted "normal mentation" but that Springer exhibited significant emotional lability and broke into tears at one point. He measured her motor strength as 5/5 in her upper and lower extremities. His impressions were: major depression. Her history was consistent with that impression. The physical exam did not yield any evidence suggesting functional limitations, but Dr. Buxton did not believe this ruled out significant psychiatric pathology. With respect to her LBP, the symptoms fit bilateral sciatic pain, but there were no signs of spinal cord compression. Dr. Buxton was confused by the results of her positive straight leg raise suggesting radiculopathy and her negative seated straight leg raise. He would have expected pain of an organic origin to have the same result in both positions. The imaging tests he reviewed were inconclusive for radiculopathy

13

and/or for identifying the precise etiology of her back pain.   Springer had significant spondylolisthesis of L5-S1 which the surgeon noted might be corrected in surgery.

Dr. Buxton believed Springer had significant pain when performing her activities of daily living but there was nothing that could be objectively verified.   Thus, he was compelled to report he could find no objective clinical evidence to support a specific functional limitation.   The alleged fibromyalgia was similar.   He did not doubt she had significant pain, but objective medical evidence of a specific functional limitation was lacking.   Dr. Buxton believed Springer cooperated fully with the exam and gave her best effort. [AR 221.]

On October 16, 2008, Springer was seen at First Choice.   The record is difficult to read but notes Springer had other appointments, one with a rheumatologist on November 3 and another with "ortho" in November.   There are no corresponding records for such appointments.   Springer complained of chronic pain.   NP Young suspected chronic fatigue syndrome/ "fibro".   She was to continue on the dosages of her medication but NP Young was not increasing them.   Depression is noted. [AR 277, 332 (duplicate).]

On October 24, 2008, there is a record indicating a consultative exam was scheduled but not performed as Springer did not show up. [AR 223.]

On October 28, 2008, Leah Holly, D.O. filled out a Physical RFC Assessment based on a record review. [AR 224.] The primary diagnoses noted were degenerative disk disease, L3-through L5-S1.   Springer was limited to lifting 20 pounds occasionally and 10 pounds frequently.   She could stand, sit, or walk for six hours.   Her ability to push or pull was unlimited.   Dr. Holly reviewed a number of the records, including the notation that Springer reported her most debilitating condition at one point was depression.   Dr. Holly found occasional postural limitations in climbing, balancing,

14

stooping, and kneeling.  There were no manipulative limitations. [AR 226, 227.] In the additional

comments, Dr. Holly noted that Springer ambulated somewhat slowly. [AR 224.]

On October 30, 2008, William Berzman, Ph.D. attempted to fill out a Psychiatric Review

Technique form, but because Springer did not show up for the examination, he concluded there was

insufficient evidence for a medical disposition.  A mental status exam was scheduled, but Springer

failed to attend it after acknowledging she would attend it.  She requested that it be rescheduled and

again failed to show up. [AR 248, 254.]

On October 30, 2008, Springer saw NP Young.  She had a cough and sore throat.  The record

may state that her back pain was stable then. [AR 276, 331 (duplicate).]

On November 4, 2008, disability services denied her SSI and DIB applications.  They noted

that Springer did not show up for a medical examination they scheduled at the agency's expense.

[AR 65, 69.]

### *2009 Records*

On January 7, 2009, Springer was seen at First Choice.  Her weight was 246 pounds.  She

rated her pain 9/10.  The note indicates Springer was stable on her medications.  She needed a refill

of Percocet.  She suffered from "severe muscle spasms" after excessive activity (i.e., cleaning

house).  She started meditation and was interested in acupuncture but could not afford it.  She did

not want an epidural injection.  NP Young noted that the medical records documented multiple

requests by Springer to increase her pain medication.[20]  However, those requests were denied as "pt

---

[20]Again, counsel's argument is not entirely accurate based on the record.  Counsel states the
medical provider declined to increase the dosage of pain medication, but counsel neglected to mention
that the medical record indicated multiple requests by Springer to increase dosages.  The medical provider
refused to increase the medications because Springer had not exhausted other means.  In addition, while
referred to UNM's pain control center, as noted by counsel, there is no indication that Springer followed
up with the referral, which counsel again fails to note. [Doc. 17, at 6.]

has not exhausted other means."  NP Young described Springer as obese, and they discussed her

diet.  Springer stated she usually cooked one meal (supper).  The assessment was chronic pain.

Springer was referred to UNM Center for Life for alternative options.  There is no documentation

in the record confirming that Springer followed up with the referral. [AR 275.]

On January 12, 2009, Springer requested reconsideration of the denials of her applications

for DIB and SSI.  She disagreed with the determinations but presented no additional evidence. [AR

75.]

On January 12, 2009, Springer filled out a Disability Report-Appeal.  She stated her pain and

depression were worse. [AR 166.] There were no new limitations.  She was sick and in pain all the

time. [AR 168.]

On January 23, 2009, Springer was seen at First Choice for a fever and cough.  She rated her

pain as 9/10.  She was tearful but calmed down.  The notes are partially illegible.  NP Young

apparently discussed various issues, including "self care" with Springer.  They further discussed

counseling, activities, and other ways to help her cope.  There are no corresponding counseling

records. [AR 274.]

On February 12, 2009, Springer still had chest congestion with a cough.  It appears she

continued to smoke, but she indicated on all of these First Choice records that she never used alcohol

or drugs.  Later records note that Springer was severely abusing drugs or alcohol in 2009.  [AR 358,

360.]

On March 7, 2009, Springer had a physical examination at First Choice.  She was in

counseling and that was working well. [AR 272, AR 327 (duplicate).] There are no corresponding

counseling records.

On March 30, 2009, Springer filled out work history information.  She worked as a landscaper/horticulturist for various companies from January 1990 to September 2006 and was self employed from March 2002 to September 2006. [AR 171.] She reported earning $13,000 to $15,000 a year, but her earning records do not indicate she made this annual salary, although she may not have worked full time.  Springer noted she supervised from 1 to 4 people. [AR 171-73.]

On March 30, Springer also filled out a Function Report.  Her daily activities included getting out of bed, making coffee, making telephone calls, reading, grocery shopping, watching television, doing laundry, cooking, and feeding the animals.  She slept for 2-3 days in a row every 2 weeks.  She felt fatigued with no appetite. [AR 178.] She prepared fast food, or meals could take her from 30 minutes to 4 hours.  She had cut down to one meal a day due to financial problems.  She went 2 days without eating.  Springer performed minimal chores.  She went out once a day, 4 to 5 times a week.  She shopped every 10 days.  She had no money to pay bills. [AR 181.]  Her hobbies were gardening, hiking, watching television, and reading.  She now could only read for the most part. [AR 182.] She reported that a neighbor molested her daughter. [AR 183.] Springer tended to isolate herself and not talk to people.  She noted she had problems with all of her capabilities except talking and hearing. [AR 183.] She could walk 300 yards; she could pay attention for 5 minutes. [AR 183.] She did not use assistive aides. [AR 184.]

On April 14, 2009, Stephen A. Whaley provided a case analysis note.  Springer's diagnoses were listed – major depression and LBP, but with no signs of spinal cord compression.  Fibromyalgia was noted, but again, there was no significant pain observed on exam.  At the time of reconsideration, Springer complained of worsening pain and depression.  She was sent a list of her activities of daily living to fill out but she did not return it.  Whaley reviewed other records in the file, before affirming the light RFC, dated October 28, 2008. [AR 288.]

17

On May 1, 2009, Springer was seen at First Choice for pain management and refills.  She weighed 238 pounds and rated her pain as 9/10.  She complained of pain everywhere and occasional swelling.  She was to be referred to the pain clinic, but it is not clear if she went to the pain clinic. [AR 326.]

On May 5, 2009, Springer was seen by Mary Loescher, Ph.D. for a mental status consultative examination. [AR 290.] Dr. Loescher prepared a thorough report, dated May 20, 2009.  The alleged problems were DJD, stenosis, depression, and fibromyalgia.  Dr. Loescher reviewed the information provided by Springer's attorney, including counsel's letter dated May 4, 2009 (that is not part of this record), a medical assessment of the ability to do work by Valerie Gove, dated August 8, 2006 (physical and non-physical) (also not part of this record), a 2005 MRI, and Dr. Radecki's records from 2004 (not part of this record).

Subjectively, Dr. Loescher noted that Springer was limited by her abilities to lift, sit, and walk.  Springer reported fatigue and pain; pain first started to affect her in November 1998.  Dr. Loescher reviewed First Choice progress reports and noted she, too, had difficulties reading at least one of the nurse practitioner's notes, dated January 23, 2009.

Dr. Loescher commented on Valerie Gove's assessment that was based on a one-time visit. Gove opined in 2006 that Springer could sit for 4 hours or less.  Fatigue would produce moderate and frequently severe symptoms.  Fatigue would make it difficult for Springer to make decisions. [AR 291.] Gove's medical assessment of Springer's ability to do work noted marked and severe limitations.  Dr. Loescher found that Gove's assessment was based on Springer's reports and the one-time visit. [AR 292.]

Dr. Loescher noted the 2005 MRI results, indicating Grade I-II spondylolisthesis of L5 on S1, and Dr. Radecki's 2004 letter, where he stated that Springer was "very functional."  As of 2004,

18

according to Dr. Radecki (as reported by Dr. Loescher), Sprinter was managing her pain well. [AR 292.]

As of this date, Springer lived with her 18 year old daughter and 19 year old son. She grew up in Ohio and moved to Florida when she was 14. She moved to the Albuquerque area about 13-14 years ago. She was married to her first husband from 1980-1996. She married again in 1996 but divorced two years later. Her mother died in 2000 from cancer. [AR 292.]

Springer was a high school graduate and had taken 90 hours of vocational training in nursery/plant operations. [AR 293.] She stated she owned her own indoor plant business from 1984-1988. Springer had not worked since September 2006. Her main source of income stemmed from death benefit checks her children received. Death benefits for her son had stopped and those for her daughter would stop soon, as well.

Based on the administrative record, Springer first reported that she was an alcoholic during this consultative exam. She believed there was no such thing as a "recovered alcoholic" and stated she was a "controlled drinker." When she cooked, Springer drank wine but "not much." She might "use" a bottle of wine a month. She used to drink at home and at a bar. She was in an accident, however, and had not been to a bar in over a year. Springer first reported using drugs when she was 11 years old. She smoked marijuana at age 13 and still used it if she could afford it. She believed it helped with her pain. She also used methamphetamine beginning in 1994, for about a year. Her

drug use was a source of conflict with her children, but she stated she admitted her mistakes.  She had not used heroin, but used mushrooms a long time ago.[21]

Dr. Loescher observed that while Springer responded to these questions, she sounded defensive, and on two occasions, she changed the topic when asked about it.  Dr. Loescher had to redirect her to the topic of drug/alcohol use.  Springer did not provide "in depth" responses as to how much drugs she used, especially her methamphetamine use and her more recent history of alcohol and marijuana use. [AR 293.]

Springer also told Dr. Loescher that at some point, she was arrested because of stealing food from Smith's grocery store.  She indicated she had been taking Xanax then, had been drinking, and was in "a blackout."  She went to jail for 3 days and was on probation for 6 months.  Springer did not provide the date of her arrest. [AR 294.]

Dr. Loescher observed that Springer's appointment that day was scheduled at 5 p.m.  At 4:40 p.m., Springer called to say she would be 15-20 minutes late.  She arrived at 5:30 p.m. and was there until 6:30 p.m.  Her daughter drove her.  Springer said her car registration expired and she could not afford to renew it.

Dr. Loescher noted that Springer got up out of the chair several times during the interview and walked around for pain relief from sitting.  She was oriented "times 3."  Springer exhibited slight to moderate irritability. [AR 294.] She reported having road rage and mood changes.  She got

---

[21]Counsel's summary of Springer's report about drug and alcohol abuse to Dr. Loescher greatly minimized what Springer stated.  Indeed, counsel's summary makes it appear that Springer had a history of drug use but was not currently using drugs. [Doc. 17, at 6.] Dr. Loescher's report of what Springer reported is to the contrary.  Springer still drank, at least to some degree, and used marijuana for pain, if she could afford it.  In addition, counsel neglected to mention Dr. Loescher's observations that Springer was defensive about her drug and alcohol use, tried to change the subject when asked, and failed to give "in depth" responses.

very depressed and irritable when she had her period.  Springer had suffered from problems of depression since she was a child.  She said she "had it bad" the last 12 years and isolated herself. She was "annoyed" with the pain in her lower back and down her legs.  She had crying spells that started last year.  She felt tired and wanted to sleep.  Springer had thoughts of committing suicide by way of drinking antifreeze, but her children kept her from it.  She was not suicidal at this time. She stated she saw a counselor in Edgewood about a month ago and that this was helpful for managing fibromyalgia.  However, in this report, Springer noted she had not been diagnosed with fibromyalgia, in contrast with an earlier record where she stated she was diagnosed with it.  Again, no corresponding counseling records were provided.  Springer experienced anxiety about her finances and lack of insurance.  She denied having hallucinations. [AR 294.]

Springer's daily activities including staying home most of the day on the couch, watching television, and napping.  She could sleep at night with the help of medication.  Her pain was 9/10. She took care of pets and could read. [AR 295.] Springer slept a lot of the day and ate one meal a day because that is all she could afford.  She had not lost weight.

Dr. Loescher administered psychological tests, including subtests of WAIS II.  Springer could remember 6 digits forward and 5 back.  This was considered normal.  Dr. Loescher found Springer's general fund of knowledge and memory were within normal ranges. [AR 295.]

Dr. Loescher concluded that Springer was not under the influence of any substance during this interview.  Springer's reported problems in the past with attendance could present limitations. She might have a moderate limitation in relating well with others at work due to her irritability and pain.  She had moderate difficulties in adapting to changes in work.  Springer had a history of inconsistent attendance and leaving work due to emotional issues.  Cognitively, Springer could handle money.

Loescher stated that it was possible "that [Springer] may be minimizing extent of her current drug/alcohol use." [AR 296.] Loescher diagnosed Springer with alcohol dependence in partial remission by report; polysubstance dependence to include methamphetamine and cocaine use in remission, by report.  She had a depressive disorder related to pain and a disorder of the spine, along with chronic pain.  Springer's psychosocial stressors were moderate to severe due to financial problems and pain.  Her GAF was 50.[22] [AR 296.]

On May 29, 2009, Springer's friend, Lynn Maichen, filled out a third-party report.  Maichen had known Springer for two years and saw her or talked to her once a week.  She tried to help Springer deal with pain and handle small tasks.  Springer used to be able to work outside and help others but could not now. [AR 189.] She awoke from pain and took medications.  Maichen described Springer as stressed.  She could dress and make sandwiches.  Maichen did her hair and cut it.  She needed reminders to eat and take medications.  It took Springer 3-4 hours to get ready to leave.  She needed a lot of emotional help. [AR 191.] She watched television and read. [AR 193.]

On June 25, 2009, Springer saw NP Young at First Choice.  She was there for pain medication refills.  Even though Springer recently discussed her drug and alcohol abuse with Dr. Loescher, this record again indicates no drug or alcohol abuse by Springer.  She was a current smoker.  The record mentions an appointment with Dr. Wagner at a pain clinic, but there is no

---

[22]Counsel for Springer emphasizes the GAF of 50, while omitting any discussion of Springer's normal results on psychological testing.  Counsel argues that Dr. Loescher's GAF score is especially helpful, "because it specified the work-related limitations, not only social limitations." [Doc. 17, at 7.] Although Dr. Loescher discussed limitations in her report, at Axis V, she simply stated Springer's GAF was 50. [AR 296.] Moreover, the Tenth Circuit repeatedly notes that generalized GAF scores, that do not specify particular work-related limitations, may be helpful in arriving at an RFC but are "not essential to the RFC's accuracy."  Luttrell v. Astrue, 453 F. App'x 786, 792 n.4 (10th Cir. Dec. 23, 2011) (unpublished) (citations omitted).

corresponding medical record from Dr. Wagner.[23]  This progress note indicates that Springer had difficulty with transportation and preferred to come to First Choice. [AR 325.]

On July 8, 2009, Jan Rankin filled out a Psychiatric Review Technique form. [AR 297.] Rankin assessed criteria for listings 12.04, 12.08, and 12.09, but did not find that Springer met the criteria.  She had mild limitations in her activities of daily living, moderate limitations in social functioning and maintaining concentration, and no episodes of decompensation. [AR 297-307.]

Rankin also filled out a Mental RFC Assessment.  Springer had moderate limitations in her ability to maintain attention and perform activities, make simple work related decisions, complete regular work day, accept instructions, respond to workplace changes, and set realistic goals.  She was not significantly limited in any other areas.  There were no marked limitations. [AR 311-13.] Rankin wrote that Springer was able to perform work where interpersonal contact is incidental to the work performed, e.g., assembly work, and where the complexity of tasks is learned and performed by rote with few variables and little judgment.  The supervision that is required would be simple, direct and concrete (unskilled). [AR 311-313.] Rankin's assessment is based on a record review.

On July 10, 2009, disability services denied Springer's request for reconsideration.  The agency found that Springer's problems were not severe enough to keep her from working. [AR 63, 64, 80, 84.]

---

[23]Counsel notes Springer's appointments with the chronic pain clinic [Doc. 17, at 8], and yet, produced no records of such appointments.  Although the record is unclear, it appears that NP Young stated on June 25, 2009, that the pain clinic wanted Springer to decrease her use of pain medication. Springer reported not wanting to go to the pain clinic at that time. [AR 325.]

On July 14, 2009, Springer lost her daughter, who died in a car accident. [AR 316.] Other records or reports indicate that during this period, Springer's drug abuse was severe and that she used methamphetamines weekly. [AR 358, 360.]

On September 23, 2009, Springer requested an ALJ hearing. There was no new evidence. [AR 87.] On the same date, Springer submitted a Disability Report – Appeal. Her pain and depression were worse. [AR 203.]

On October 15, 2009, there is a handwritten note (not entirely legible) by Dr. Sutter, a psychiatrist, with Sage Neuroscience. There is no letterhead or agency identification, but this appears to be the sole counseling record provided by Springer. The note indicates Springer was dealing with the death of her daughter. She suffered from bouts of depression, loss of appetite and low interest. Springer's son was driving the vehicle when the accident occurred, although the son was not injured badly. Springer described being depressed her "whole life." She was first treated 12 years ago when the childrens' father died. Following that death, Springer's brother and mother died. Springer was not dating but felt she had a good support system. This record indicates no alcohol, no tobacco, and no substance abuse, and no "sig past use." [AR 317.] Clearly, Dr. Sutter's information about drug and alcohol use was not accurate.[24]

Dr. Sutter discussed Springer's L4-L5 injury from 10 years ago and that she took Percocet. [AR 317-18.] He described Springer as well dressed, sad, and depressed. She was dealing with her

---

[24]Springer's attorney emphasizes Dr. Sutter's diagnoses and the fact that Dr. Sutter added Clonazepam (Klonopin) to her medication regimen. [Doc. 17, at 8-9.] Yet, counsel does not mention Dr. Sutter's notations indicating (inaccurately) that Springer was negative for alcohol use, tobacco use, substance use or past use. [AR 317.] While true that this was a period of intense grief for Springer in relation to her daughter's death [Doc. 17, at 8], this also was a period of significant drug or alcohol abuse by Springer according to her own reports to other examiners.

present grief.  PTSD is noted but the notes are not entirely legible.  Dr. Sutter diagnosed Springer with major depressive disorder that was recurrent and severe.  He assigned a GAF of 50. [AR 319.]

On October 22, 2009, Springer was seen by NP Young at First Choice.  She had lost weight and weighed 206.6 pounds.  She rated her pain 9/10.  Again, the note indicates no use of drugs or alcohol.  She had been seeing Dr. Sutter for grieving and depression.  Her back pain was better.  The note may indicate Springer stopped smoking. [AR 324.]

On December 16, 2009, Springer was seen by NP Young.  She had stopped smoking.  She weighed 205 pounds.  Her pain was 10/10.  She suffered from chronic back pain.  It looks like the note indicates Springer's recent prescription was stolen.  The prescription was not replaced and the note indicates Springer understood.  But, the note is not entirely legible. [AR 323.]

### ***2010 Records***

On January 20, 2010, NP Young saw Springer at First Choice.  Springer weighed about the same.  Her pain again was 10/10.  The record indicates no drug or alcohol use.  Springer reported waking up on a couch with her feet crossed "wrong."  She complained of severe pain.  Her knee was worse than her back.  She was referred to physical therapy. [AR 322.]

On January 27, 2010, Springer was seen for physical therapy for a right knee strain at Active Solutions Therapy Services.  She stated that she hurt her knees about 6-7 years ago when pushing a wheelbarrow through deep mud.  She had pain on and off since then.  Springer reported that, earlier, on January 9, 2010, she awoke on a couch with severe right knee pain and was unable to put weight on it for a few hours.  She ambulated with a significant limp that day and was using a cane.  Springer was to receive therapy twice a week for 4-6 weeks.  But, she was seen on February 3 and February 5, and then stopped going to physical therapy. [AR 347-48.]

25

On February 10, 2010, Springer reported to NP Young that she felt the physical therapist "had issues with her." She wanted to change physical therapists. She requested Valium. [AR 321.]

On April 13, 2010, there is a letter from Springer's attorney to the ALJ, with medical records. The letter or records indicate that Springer was seen by Dr. Sutter from September 2009 to the present, but as noted, there is only one medical record from Dr. Sutter. She also was seen by Dr. Wagner in May 2009, not there are no corresponding medical records. The letter states something about a psychologist in Placitas from August to December 2009 and Mountain Community Counseling in Cedar Crest from December 2009 to the present. There are no counseling records. [AR 343.] At this time, Springer was taking Percocet, Neurontin, Trazodone, Klonopin, and Effexor. [AR 344.]

On April 13, 2010, Dr. John Vigil performed an independent medical examination at the request of Springer's attorney.[25] [AR 350.] His review of medical records took 30 minutes, and the interview was another 30 minutes. Springer's chief complaints were chronic back pain, fibromyalgia, and depression. [AR 350.] She reported to Dr. Vigil that she had been told she was born with an "underdeveloped spine," but there is no related medical evidence. Her conditions were treated with pain medications, but she did not have insurance and could not afford treatment.

Springer discussed falls that occurred in 1998 and 2001. [AR 350.] She rated her pain as 7/10 on average. She had bladder urge incontinence but denied bowel complaints. The pain awoke her at night. She was depressed since 1997, after her ex-husband and friend died. Her daughter recently died in car accident. Springer denied any suicide attempts or suicidal ideation at present. She had been taking medications since 2005 and received counseling twice a week, although, again, there

---

[25]While Dr. Vigil assessed both physical and non-physical limitations, it is not clear what his specialization was.

are no corresponding counseling records, with the exception of a single record by Dr. Sutter.  In spite of medications she took, she still felt depressed.

There is a brief reference in this report to Springer's history of "alcohol and amphetamine addiction." [AR 351.] Springer reported she stopped using drugs or alcohol one year ago, or in about April 2009. [AR 351.] This does not appear accurate based on other records.  Springer informed Dr. Vigil that she was diagnosed with fibromyalgia one year ago, but there is not an actual diagnosis in the medical record based on objective medical evidence.  She suffered from widespread pain affecting her neck, shoulders, and lower extremities.  The medications "mildly" relieved her pain. Prolonged sitting, standing, walking, or bending aggravated the pain.  She could not sit for longer than 10 minutes.  She had difficulty walking and using stairs.  She used a motorized vehicle when shopping.  She could not lift more than 10 pounds and could not push a full grocery cart.

Springer could drive short distances and did not need help dressing herself.  She completed a pain disability questionnaire for Dr. Vigil with a resulting score of 136, indicating a severe problem with chronic pain.  The questionnaire is not part of the record.  She also completed a "QuickDash questionnaire"[26] with a score of 70, indicating a severe problem. [AR 351.] Again, it is not part of the record.  Her past assessments were chronic back pain, depression, alcohol/drug addiction, and hypertension.  She was taking Percocet, Neurontin, Trazodone, Effexor, Flexeril, Xanax, and Detrol.  Her parents abused alcohol according to Springer, but she denied alcohol, tobacco, or drug use.  She was divorced and lived with her son.  She received economical support

---

[26]"The QuickDASH is a shortened version of the DASH Outcome Measure. Instead of 30 items, the QuickDASH uses 11 items to measure physical function and symptoms in people with any or multiple musculoskeletal disorders of the upper limb." http://www.dash.iwh.on.ca/quickdash (3/21/13).

from her son and received food stamps. [AR 351.] She denied weight loss but complained of incontinence. [AR 352.]

Dr. Vigil observed that she walked into the clinic, but that she walked slowly and with obvious discomfort. She sat for 35 minutes during the interview with constant shifting. She could rise from a chair and the exam table slowly and with obvious discomfort. Springer could sit up from lying without assistance. She could not walk on her heels, squat, or hop. She was alert and cooperative. She broke into tears when talking about he daughter.

Dr. Vigil noted normal neurological testing. Her muscle strength was 5/5. She had 12/18 multiple and symmetrical tender points involving multiple myofascial sites on her back, neck, trunk and extremities. Her gait was slow. She could walk on her toes but not heels.

Dr. Vigil's assessment was: chronic lower back pain, spondylolisthesis grade I-II, fibromyalgia, depression, and anxiety. [AR 353.] After his review of the records and the examination, Dr. Vigil opined that "within a reasonable medical probability," Springer had "severe disability" with respect to chronic back pain, fibromyalgia, and depression. He further opined that she was at maximum medical improvement, was permanently and totally disabled, and not capable of gainful employment, "secondary to her disabilities."

On May 6, 2010, Dr. Vigil also filled out an assessment of Springer's ability to do work-related activities (both non physical and physical). [AR 354, 355.] With respect to non physical limitations, he found that Springer suffered from severe pain, sleep disturbance, and fatigue. She had to lie down regularly. He concluded she had marked limitations in all work activities, including concentration, scheduled activities, regular attendance, maintaining physical effort, sustaining ordinary work routine, working in coordination, making simple work-related decisions, and completing a normal work day. [AR 354.]

28

Regarding Dr. Vigil's assessment of physical limitations, he found that Springer could lift less than 5 pounds occasionally or frequently, she could stand or walk for less than 2 hours. She could sit for less than 4 hours. Her ability to push or pull was limited. However, Springer could do repetitive actions with her hands and fingers. She was never able to kneel, stoop, crouch, or crawl.

On May 17, 2010, Brenda Wolfe, Ph.D., a clinical psychologist, performed a psychological evaluation at the request of Springer's attorney. [AR 357.] She reviewed Vigil's records from Sage, First Choice, and others (not all are included in this administrative record). Springer reported similar problems to Dr. Wolfe, including a history of a fall in 1998, inability to lift heavy objects, inability to continue her business. She reported chronic depression dating to the age of 11. Notwithstanding the long term depression, Springer appeared to have functioned adequately until 1997, when her ex-husband died. Since that time, she suffered from dysphoria, insomnia, poor appetite, anhedonia, impaired memory and concentration, feelings of hopelessness, and passive suicidal ideation. She rated her depression 9/10. That remaining was fairly consistent between 1997 to 2008, when it dropped to 8/10 before her daughter died 10 months ago.

About every 3 weeks, Springer stated her depression was so severe she had to go to bed for 2-3 days at a time. [AR 357.] She had close friends but did not always want to see people. She reported constant anxiety and worry. She also reported 2 panic attacks since December 2009, and frequently experienced surges of anxiety with tachycardia, shortness of breath, trembling, abdominal pain, tingling, and inability to think straight. [AR 357, 358.] None of these reported problems, beginning with the panic attacks, are documented in the medical records unless such records were illegible.

Springer stated she could go out, run errands, and visit friends. [AR 358.] With respect to her use of alcohol, Springer stated she had a "couple of glasses of wine approximately once a

29

month." She then said she did not care for alcohol. She also informed Dr. Wolfe that she used methamphetamine two times per month during 1995, and from 1998 through 2008. She used methamphetamine weekly in 2009, after her daughter's death until November 20, 2009 when she stopped using. Until a couple of years ago, Springer used marijuana and cocaine, occasionally. She now attended "abstinence class" on "most Saturday mornings." She quit smoking one week ago. [AR 358.]

Based on the medical records and Springer's reports, Dr. Wolfe concluded Springer had severe pain, and that she was diagnosed with degenerative disk disease and fibromyalgia. She reported depression since childhood. She was neatly groomed, had good hygiene, and was overweight. [AR 358.] She exhibited repeated crying to most questions during the 2-hour exam. Dr. Wolfe found that her crying appeared genuine. [AR 360.] She frequently shifted while seated and also "shuffled around" the room to relieve her discomfort. Her mood was depressed, and she had memory problems. She watched her father and stepfather abuse her mother. Her stepfather was an alcoholic, and he abused or molested Springer.

Springer exhibited good effort during testing. The BDI test results showed that Springer was severely depressed. [AR 360.] Her anxiety and panic score exceeded the cut off for anxiety disorder. Dr. Wolfe diagnosed her with major depressive disorder. Dr. Wolfe felt it appropriate to mention Springer's drug abuse. She found Springer's "presentation" to be genuine. While her drug abuse sounded severe in 2009, Dr. Wolfe believed it was less so in previous years, and that across time, it was likely "a response to dysphoria rather than a contributing factor." [AR 360.]

Dr. Wolfe found that Springer was unable to work at this time and had been unable to work since before 2007. The severity of her depression, combined with anxiety, made it extremely difficult for Springer to sustain a conversation without succumbing to tears. Dr. Wolfe also

diagnosed Springer with generalized anxiety disorder, degenerative disk disease, chronic back pain, and fibromyalgia. Her GAF was 45. [AR 360.]

On May 14, 2010, Dr. Wolfe filled out an assessment of ability to do work-related activities (mental). [AR 361.] Dr. Wolfe did not mark the boxes on the form for Springer's ability to remember locations or understand very short instructions. It is not clear if this was an oversight or intentional. Dr. Wolfe could have marked the boxes for slight, moderate, or marked limitations in these areas. Dr. Wolfe checked off the "marked limitation" boxes for almost all areas of sustained concentration and persistence. [AR 361.] She found marked limitations in almost all areas of social interaction. [AR 362.] Springer was rated with slight limitations in the adaptation categories. Under "substance abuse," Dr. Wolfe answered that Springer had a current problem with alcohol or substance abuse, but found that Springer's ability to function was not affected by that. Instead, her mental impairments, according to Dr. Wolfe, were the sole cause of her inability to return to a work setting. [AR 362.]

With respect to listing 12.04 (affective disorder), Dr. Wolfe found that Springer met sufficient criteria for the listing. The same was true for listing 12.06 (anxiety). [AR 363, 364.]

Counsel for Springer supplied these reports to the ALJ before the May 18, 2010 hearing. [AR 349, 356.]

At the May 18, 2010 ALJ hearing, Springer testified that she suffered from pain shooting down her legs to her knees. [AR 37.] She reported she had a degenerative joint disorder that she could control with pain medication. If, however, she worked, she would "over do it," and "pay for it." She stated she was diagnosed with chronic lower back pain and fibromyalgia. She had pain throughout most of her body on some days. Neurontin helped. [AR 38.] She described being depressed since 1997 and various personal losses since 1997, including the death of her daughter.

During the hearing, Springer had to stand up at times. [AR 42.] She could sit for 20-25 minutes and could walk a few blocks. She was supposed to exercise and do yoga. [AR 43.]

In response to her attorney's questions, Springer testified that she had leg pain every day and that it lasted 24 hours. The pain medications deadened the pain a little bit to the point where it was tolerable to get out, walk, or do some chores. [AR 43.] She could walk 2 blocks but had to stop due to achiness in her legs and buttocks. She could lift 10 pounds, although she used to lift 50-75 pounds. [AR 44.]

Generally, Springer remained at home, reading, doing chores, feeding animals, and gardening. She paced herself. She could, for example, pull weeds 1-2 days a week for 30 minutes a day. She took a number of medications, and they made her tired at the end of the day. She had difficulty sleeping if she did not take her medications. Her insurance did not cover the full amount of her anti-depressant, Effexor, so she took only half the prescribed dosage. [AR 47.]

Springer "managed" but isolated herself. She took her medications reliably. [AR 47.] A friend drove her to the hearing. Although she could drive, she had limited funds. When in the car, Springer had to stop periodically and get out to stretch. [AR 48.] She suffered from incontinence every day, although the medications helped. [AR 48.]

Springer testified that she was taking a "narcotics course [t]hrough my therapist, just voluntarily, just to educate myself. And one day I would like to educate children." [AR 51.] Springer was in recovery from drug/alcohol abuse since November 20, 2009 and stated she was completely clean since that date. [AR 51.]

Springer stated that her right knee "clicked," and that she could not squat. She thought she had carpal tunnel syndrome. [AR 52.]

32

Springer's friend, Lynn Maichen, then testified in response to the attorney's questions. [AR 53.] Maichen stated she had known Springer since 2006 and that she sees her 3 times a week. Maichen tried to give Springer support; in the last 2 years, Springer's physical condition worsened. [AR 54.] They had to stop that day on the way to the hearing because of Springer's incontinence that happened very often. [AR 55.] She also needed to get out of the car because of pain.  Maichen testified that she often saw Springer crying.

The vocational expert ("VE") testified that Springer generally could not perform her prior work as a plant care worker or landscape specialist. [AR 57-58.] The ALJ asked the VE to consider that Springer had "pain that is noticeable to her at all times and psychologically based symptoms" and was limited to the lower end of detailed tasks, "no complex tasks."  Would she be able to do any of prior work with those limitations?  The VE thought Springer could perform "at light, the housekeeping cleaner, and the bartender." [AR 58.] But, the receptionist work would require more than the lower end of detailed tasks, so she was unable to perform that prior work, under the hypothetical. [AR 58.] The VE further testified that the housekeeping cleaner job did not require interaction with the public and required only occasional stooping.  [AR 59-59.]

The ALJ then asked: "Now when you put all of symptoms together, the physical pain, fibromyalgia and degenerative joint disease and the psychological problems, and she might miss work – maybe more than one to two times a month, . . . would she be able to maintain employment in any of those jobs?"  The VE testified that most employers would not tolerate a person missing work that often or that consistently.  [AR 59.]

Springer's attorney asked the VE some questions, including whether all jobs would be ruled out if Springer could lift less than five pounds, stand less than two hours in an eight-hour day and

sit less than four hours of an eight-hour day.  The VE testified that he believed those limitations

would exclude all the jobs. [AR 59.]

On June 23, 2010, the ALJ issued a written decision concluding that Springer was not

disabled and not entitled to SSI or DIB. [AR 18-30.] The ALJ decided that Springer could perform

her past relevant work as a housekeeper/cleaner and bartender.   The ALJ wrote:

> In comparing the claimant's [RFC] with the physical and mental
> demands of this work, I employed the use of a vocational expert to
> help determine the extent to which an individual would be able to
> perform their past work.  I asked the [VE] at [the] hearing if any of
> the claimant's past relevant would be able to be performed, either as
> the claimant performed it, or as it is customarily performed in the
> national economy, given the above [RFC].  The [VE] testified that
> such a hypothetical individual could perform the jobs [of] bartender
> and housekeeper/cleaner.   Based on the above, I find that the
> claimant is able to perform the jobs of bartender and
> housekeeper/cleaner as actually and generally performed in the
> national economy.

[AR 29.] In examining the hearing transcript, the VE testified that he did not know how the

housekeeper/cleaner work was performed, "broken down" of how long Springer worked in that

position, "what percentage of the time was done."  He did testify that the job was light. [AR 57.]

The VE further testified that he had no information except testimony about the receptionist and

bartender work.  The bartender was rated as light. [AR 57.]

### *2011-2012 Records*

There are no records in 2011.  On February 2, 2012, the Appeals Council denied Springer's

request for review. [AR 1-4.]

VI.   **DISCUSSION**

A.   Alleged Legal Errors

Springer sets out the following alleged errors: (1) the ALJ's RFC finding is contrary to the evidence and law, thereby rending the past work finding contrary to law; (2) the ALJ failed to perform a sufficient past-work analysis; and (3) the ALJ's credibility findings were contrary to law. [Doc. 17, at 4.]

B.   RFC Analysis

RFC represents "the most [that the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). It is an administrative assessment of how a claimant's impairments and related symptoms affect her ability to perform work related activities. Young v. Barnhart, 146 F. App'x 952, 955, 2005 WL 2065301, at *3 (10th Cir. Aug. 29, 2005) (unpublished); *see also* SSR 96–5p, 1996 WL 374183, at *5 (July 2, 1996).  Determination of a claimant's RFC is well within the province of the ALJ because the assessment is based upon all of the evidence in the record, not only the relevant medical evidence  Dixon v. Apfel, No. 98–5167, 1999 WL 651389, at *2 (10th Cir. Aug. 26, 1999); 20 C.F.R. §§ 404.1545(a), 416.945(a).

In determining a claimant's RFC, the ALJ must consider any medical opinions about what the claimant can still do, along with the claimant's own testimony concerning her limitations, including limitations resulting from pain.  20 C.F.R. § 404.1545(a)(3).  In assessing the RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]"  Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010) (*quoting* 20 C.F.R. § 404.1545(e)).  Credibility findings are intertwined with RFC findings.  *See* Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009) ("the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC").

Step four of the sequential analysis is comprised of three phases.

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), ... and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work.... In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.... At each of these phases, the ALJ must make specific findings.

Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (alterations in original) (citations omitted) (internal quotation marks omitted).  Each of the step four findings must be supported by substantial evidence.  *See* Watkins v. Barnhart, 350 F.3d 1297, 1299 (10th Cir. 2003).

       1.   Physical Limitations

Here, the ALJ found that Springer had the RFC to perform light word as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except that she can only occasionally stoop. The ALJ further found Springer could "understand, remember, and carry-out the lower end of detailed tasks due to psychologically based symptoms and pain.  She is able to respond appropriately to changes in a routine work setting." [AR 21.]

Springer argues that the ALJ's finding that she could do a reduced range of light work did not take into account the majority of her functional limitations. [Doc. 17, at 13.] In support of this position, Springer refers to social security forms she filled out, showing minimal household activities and limited abilities to stand, walk or sit.  Springer contends that these complaints are supported by objective medical findings, including the 2005 and 2008 MRI or xray results.

Springer asserts that the ALJ failed to mention, discuss, or acknowledge in any way the 2005 xray and MRI findings, although admittedly, the ALJ recited the findings from the June 2008 MRI.

[Doc. 17, at 14; AR 23.] Springer argues that "this error tainted" the ALJ's treatment of other evidence, for example, the weight assigned to Dr. Vigil's and Dr. Buxton's findings.

Springer argues that the June 2008 MRI revealed further degeneration (in contrast to the 2005 tests), although it is not clear that a doctor made that determination.  Still, assuming the 2008 MRI findings represented further degeneration, it is unclear why Springer insists the ALJ should have mentioned the 2005 MRI.  Moreover, the ALJ noted that he considered the "entire record."  He is not required to specifically discuss each and every record.  *See* <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009–10 (10th Cir. 1996) ("[A]n ALJ is not required to discuss every piece of evidence.").[27]

In reaching Springer's RFC, the ALJ considered Springer's hearing testimony, her complaints of pain, effects of medication, conditions she alleged she was diagnosed as having, *e.g.,* fibromyalgia, her alleged limitations, depression, molestation as a child (verbal and sexual abuse by her stepfather), loss of her daughter in July 2009, loss of other relatives, daily activities, regular use of narcotic painkillers, difficulties sleeping, lack of insurance for all prescriptions, and her allegations of being sober and clean since November 20, 2009. [AR 22-23.]

The ALJ also noted her friend, Lynn Maichen's testimony about Springer's physical and emotional limitations and the assistance Maichen provides to Springer. [AR 23.]

The ALJ devoted six to seven pages to a discussion of Springer's treatment records, consultative examinations, testing, diagnoses, GAF scores, physicians' assessments of what Springer could do, Springer's reports about drug/alcohol use and her subjective complaints of pain, impact

---

[27]Counsel's reliance on <u>Clifton</u>, 79 F.3d at 1009-10 for the proposition that the "ALJ must discuss the issue [2005 or 2008 MRI?] and must give reasons for his conclusions" is inaccurate or unpersuasive. <u>Clifton</u>, as cited, stands for the proposition that the ALJ need not specifically discuss each piece of evidence.  Moreover, it is not clear why the 2005 MRI, which does not appear significantly different than the 2008 MRI, applies to the pertinent time frame, September 8, 2006, onset, through June 23, 2010.

of obesity, mental impairments, medical treatment, and the weight the ALJ assigned to the various medical care providers' opinions. [AR 23-29.]

The ALJ concluded that the objective medical evidence and Springer's hearing testimony did not fully support her severe and limiting allegations.  He further explained that while Springer consistently complained of pain to physicians, she also indicated, at times, that her medications were working.  The ALJ noted that Springer testified at the hearing that her pain medication helped her with subjective symptoms of pain. [AR 27.] Such statements raised questions for the ALJ regarding the impact of Springer's complaints of pain.  He also observed that Springer refused to undergo epidural steroid injections and only attended a few sessions of physical therapy.  Thus, the ALJ found her credibility further eroded regarding her subjective complaints of pain.

The ALJ examined multiple records or visits to health care providers where Springer denied alcohol or drug abuse and then admitted to historical and current abuse when examined by consultative examining physicians.  Such inconsistencies raised further doubts for the ALJ in assessing Springer's credibility about alleged limitations.   Notwithstanding these various inconsistencies, the ALJ gave Springer the benefit of the doubt and found that her condition would likely impose "some restrictions upon her RFC."  Thus, he limited her to a restricted range of light work. [AR 27.] He noted that the objective medical evidence, when viewed in the light most favorable to Springer, did not warrant further limitations.

Springer argues that the 2005 xray/MRI findings and the 2008 MRI are objective evidence of "extensive degenerative disc disease stenosis are all consistent with persistent complaints of back pain." [Doc. 17, at 14.] The ALJ discussed the 2008 MRI results that revealed a grade 1 anterior subluxation, and a mild to moderate diffuse disc bulge at one level and a mild diffuse disc bulge at another. [AR 23.] While not mentioned by Springer's counsel, the 2008 MRI revealed "grade 1"

anterior subluxation of L5 upon S1. [AR 283.] The MRI reports never stated that Springer had

"extensive degenerative disc disease."   Indeed, "grade 1" is typically defined in the medical

literature   as   the   least   amount   of   subluxation   possible.   *See*

http://www.mdguidelines.com/spondylolisthesis (3/21/13) ("The severity of subluxation is graded

as follows: Grade I is 0% to 25%, Grade II is 26% to 50%, Grade III is 51% to 75%, and Grade IV

is more than 75% of vertebral slippage as evidenced on x-ray.").  Moreover, the ALJ described the

disc bulges, as reported in the MRI, to be mild or mild to moderate – not extensive or severe. [AR

23.][28]

Springer takes issue with the weight the ALJ afforded Dr. Vigil's assessments, in part

arguing that Dr. Vigil had the 2008 MRI and, therefore, purportedly conclusive objective medical

evidence confirming Springer's extensive degenerative disc disease.  The ALJ discussed Dr. Vigil's

exam and report at length. [AR 25-26.] The ALJ first observed that Dr. Vigil spent a total of 90

minutes in reviewing records, conducting the exam, and writing the report.  Dr. Vigil's actual exam

of Springer lasted 30 minutes. [AR 350.]

The ALJ commented that Dr. Vigil noted Springer was able to walk slowly, rise from a chair,

and get onto a treatment table without assistance although she was in obvious discomfort. [AR 25,

352.] The ALJ noted Dr. Vigil's findings that Springer had 12/18 multiple and symmetrical tender

points, but that her DTR were normal in the right/left upper and left lower extremities and there was

------

[28]Additionally, this case is not like Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004), cited
by Plaintiff in support of the position that "extensive degenerative disc disease and spinal stenosis" are
consistent with back pain.  Medical records in Hardman, unlike those here, stated the claimant had
extensive degenerative disc disease, including herniated discs.  In Hardman, the Tenth Circuit reversed
and remanded, in part, because the ALJ provided only boilerplate language concerning his credibility
analysis rested entirely on his determination that there was a lack of objective medical tests.  Such is not
the case here, where the ALJ made extensive credibility findings and provided an in-depth discussion of
the objective medical evidence.

no significant muscle atrophy in the major muscle groups.  The ALJ observed Dr. Vigil's findings that Springer's muscle strength was 5/5 in upper and lower extremities. [AR 26.]

The ALJ recited Dr. Vigil's opinions that Springer was permanently and totally disabled and that Dr. Vigil did not believe she could work secondary to her impairments.  The ALJ also discussed Dr. Vigil's RFC document where Dr. Vigil marked mostly marked limitations in all available categories. [AR 26.]

In giving little weight to Dr. Vigil's opinions [AR 28], the ALJ provided numerous grounds. For example, he noted that Dr. Vigil was one of a number of physicians to whom Springer made inconsistent statements.  For example, during Vigil's examination, Springer both admitted drug and alcohol use and denied it. [AR 25, 351, 352.] The ALJ compared the findings and examinations of Dr. Vigil and Dr. Buxton, observing that Springer's performance at the Vigil examination was significantly more limited than findings during her physical examination with Dr. Buxton. [AR 28.] The ALJ discussed that Dr. Vigil's examination did not reveal any significant or severe abnormalities in Springer's lumbar spine, even though that was Dr. Vigil's justification for the assessed limitations.  The ALJ concluded that Dr. Vigil relied "quite heavily on the subjective report of symptoms and limitations" provided by Springer, and "seemed to uncritically accept as true, if not all, of what the claimant reported." [AR 28.] Yet, as accurately observed by the ALJ, there was good reason to question the reliability of Springer's subjective complaints.[29] [AR 28.]

---

[29]Counsel for Springer disagrees that Dr. Vigil made no findings about tenderness in Springer's back.  Moreover, he cites a case for the proposition that fibromyalgia is characterized by "pain all over" and multiple tender spots on at least 11 of 18 fixed locations on the body. [Doc. 17, at 15.] Yet, as noted in this opinion, Springer herself was inconsistent about how, when, or if she was diagnosed with fibromyalgia.

In discussing Springer's physical limitations in relation to the RFC, the ALJ relied on Dr. Buxton's consultative examination and findings. [AR 23.] Dr. Buxton noted Springer could ambulate slowly, get on and off the exam table, and get up from the chair, all without significant difficulty. The ALJ discussed Dr. Buxton's findings at length [AR 23-24], noting that while Dr. Buxton believed Springer suffered from pain, there was no objectively verified physical limitations. [AR 24.]

The Court concludes that the ALJ's RFC with respect to Springer's physical limitations and the related credibility findings were supported by substantial evidence and that the ALJ committed no error.

        2.     <u>Mental Limitations</u>

The ALJ determined that Springer could understand, remember, and carry-out the lower end of detailed tasks due to psychologically based symptoms and pain. He also found that Springer could respond appropriately to changes in a routine work setting. [AR 21.] The ALJ evaluated Springer's functional limitations in four areas. He concluded that Springer's mental impairments did not restrict her activities of daily living, created mild difficulties in maintaining social functioning, resulted in moderate deficiencies of concentration, persistence, or pace, and did not result in any episodes of decompensation. [AR 27.]

Ultimately, at step 4, the ALJ determined that Springer could perform past relevant work as a housekeeper/cleaner and bartender. The ALJ stated these jobs were performed by Springer within 15 years of the date of the decision, that she performed these two jobs "above substantial gainful activity levels, and [that she] did so long enough to learn the abilities necessary to satisfactorily complete her duties." [AR 29.]

The ALJ further stated he compared Springer's RFC with the physical and mental demands of the jobs, by employing the use of a VE to "help determine the extent to which an individual would be able to perform their past work." The ALJ wrote that he asked the VE at the hearing if Springer would be able to perform her past relevant work, either as she performed it or as it was customarily performed in the national economy. According to the ALJ, the VE testified that such a hypothetical individual could perform the housekeeper/cleaner and bartender positions. [AR 29.] Thus, the ALJ found that Springer could perform the jobs of bartender and housekeeper/cleaner as they actually and generally are performed in the national economy.

The Court finds that the ALJ committed error in this analysis or that substantial evidence does not support the finding that the jobs of bartender and housekeeper/cleaner were past relevant work that Springer could perform with her limitations. The Court will remand on this basis for additional administrative hearings, and further suggests that the ALJ may need to proceed to step 5 of the analysis before making the ultimate decision on the benefit applications. The Court's decision is not an indication of whether this Court believes Springer is entitled to benefits.

The Court observes that it could locate only minimal evidence in the record about Springer having worked as a bartender. There is nothing in the disability reports about when that work occurred, how long she held the position, or how she performed the job. In the hearing, Springer was asked if she worked as a bartender; she answered affirmatively but explained that the work involved a lot of heavy lifting and being on her feet. She seemed uncertain when she performed that job but thought she had in the early 90s. There was no discussion of how long she worked as a bartender. [AR 50.]

In Springer's Disability Report, she stated she worked as a landscaper from 1990 to 2006. [AR 158.] There was nothing in that report about bartending or housecleaning. In the Work History

42

Report, Springer wrote that she was a landscaper for various companies and was a self-employed landscape worker. [AR 171.] In small print, she stated she worked in the "yard and house cleaning" from 3/2002 to 9/2006. [AR 171.] In her description of the "landscape/yard and house cleaning" work, she stated she picked up trash from yards, took trash to the dump, and "also did some house cleaning. . . ." [AR 172-73.] She noted the use of a vacuum cleaner, "laundry, brooms."  She lifted up to 50 pounds on the job. [AR 173.] That work history form did not describe bartender employment.

The Court does not find substantial evidence in the record to support a finding that Springer performed the positions of house cleaner or bartender long enough for the claimant to have learned to do the jobs or that they constituted significant gainful activity. [*See* AR 20.]

There really is no description of how Springer may or may not have done these jobs, if she did them.  There are minimal descriptions of house cleaning work and bartending.  Instead of providing supporting evidence of such employment, the VE was not at all clear about these jobs, noting only that there was "mention" of a housekeeper.  But, the VE testified he did not know how that job was broken down, how long Springer performed it, or what duties she did.  He did not have any information about the bartender job except for "testimony." [AR 57.]

Clearly, the VE did not testify how Springer performed the jobs of house cleaner or bartender as there was no such evidence.[30]  The VE also did not testify how those jobs were performed in the national economy other than to note the ratings of light work. [AR 57.] Moreover, when asked to consider all of Springer's limitations together, including the psychological problems and the

---

[30]Indeed, the Commissioner conceded that the ALJ's analysis regarding the bartender position was deficient, but argues that substantial evidence supported the ALJ's determination that Springer could perform the housekeeper/cleaner work. [Doc. 18, at 10, n.2.]

possibility that she would have to miss work more than two times a month, the VE testified she could not perform those positions or that employers would not accept that type of work schedule. [AR 59.]

The Court does not find the VE's testimony about the prior work to be substantial evidence supporting the ALJ's finding that Springer had PRW she could perform with her limitations. This is especially true with respect to her mental limitations that the Court does not believe the ALJ fully considered in light of the objective medical evidence.

For example, the record demonstrates repeated complaints and diagnoses of depression, along with prescribed medications for depressions and counseling. See, e.g., [AR 147 (alleged depression); 157, 162 (alleged depression; taking Lexapro for depression); 165 (taking Zoloft for depression); 178 (can't do much but read);  221 (diagnosis of major depression; significant psychiatric pathology could not be ruled out);  272 (allegedly in counseling); 274 (allegedly in counseling); 277 (depression reported to PCP); 279 (depression reported to PCP); 290 (taking Effexor for depression; depression disorder; moderate difficulty to relate well); 200 (alleged depression); 316 (taking Effexor and Trazodone for depression/sleep and Clonazapam for anxiety; allegedly depressed all of her life); 319 (diagnosed with major depressive disorder, recurrent, severe); 324 (reported depression to PCP); 350 (in spite of medications, still depressed; taking Effexor for depression); 354 (diagnosis of major depressive disorder); 357 (reported chronic depression, anhedonia, hopelessness, passive suicidal ideation); 358 ( taking Effexor for depression; repeated crying during 2 hour interview; depressed mood observed); 359 (psychological testing indicates severe depression); 360 (psychological testing indicates anxiety disorder; diagnoses of major depressive disorder); 361 (marked limitations in ability to do work related activities in mental categories).

It is far from clear, based on this record, whether substantial evidence supports the ALJ's decision to disregard or discount the opinions of the medical consultants concerning Springer's alleged mental impairments.  Similarly, the Court concludes that substantial evidence does not support the ALJ's finding that Springer could perform both the physical and mental demands of her past relevant work, to the extent that the housecleaning job could be considered past relevant work. The ALJ did not sufficiently develop the record with factual information concerning the demands of that prior work, nor did Springer provide any testimony about the work.

The Court recommends that this case be remanded for additional administrative hearings for the ALJ to reassess Springer's RFC, based on mental and physical impairments, and also so that the ALJ can conduct a step 5 analysis, as needed.  Should the ALJ again determine that Springer has past relevant work she can perform, the ALJ should adequately develop the record in order to assess whether she can perform the demands of the past work, in light of her RFC.  *See* Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).

Additional development of the record may require obtaining Springer's counseling records and all other related records referred to in the medical records.  An additional consultative examination may be required to resolve any internal inconsistencies in previous consultative examinations or inconsistencies between consultative examinations.[31]

---

[31]The Court reiterates that the ALJ's well-explained credibility determinations and findings with respect to physical limitations were supported by substantial evidence.  Like the ALJ, the Court has serious reservations about Springer's credibility as it relates to her possible current drug and alcohol abuse, and questions if counseling records were not provided for reasons related to drug and alcohol use.

**<u>Recommendation</u>**

The Court recommends that Plaintiff's motion be granted, as described herein, and that this matter be remanded for additional administrative hearings.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge